**SIGNED THIS: December 18, 2008**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CENTRAL ILLINOIS ENERGY, L.L.C., | ) | No. 07-82817 |
| | ) | |
| Debtor. | ) | |

**O P I N I O N**

This matter is before the Court on the Application for Allowance of Attorney's Fees, Expenses and Costs (the "Fee Application"), filed by the Debtor's attorneys, Barash & Everett, LLC ("B&E"), and the objections thereto by the United States Trustee ("UST") and by Suzanne M. Ginger.

**BANKGROUND**

The Debtor, Central Illinois Energy, L.L.C. ("DEBTOR" or "CIE"), filed a voluntary Chapter 11 petition on December 13, 2007, with the assistance of its bankruptcy counsel, B&E. Around the time of the filing, B&E was paid a retainer of $90,000 and entered into a written contract with CIE entitled Agreement to Employ Barash & Everett, LLC in Chapter 11 Reorganization (the "Retention Agreement").

The Retention Agreement provides that one-third of the retainer "shall become the immediate property of the firm and may be deposited in our operating or business account and not the firm's client trust account to apply against pre-petition legal work, petition preparation and filing." It further provides that the remaining two-thirds of the retainer will be deposited in B&E's trust account. The Retention Agreement also provides that attorney's fees will be charged on an hourly basis at certain rates set forth in an hourly rate table. The rates listed in the table include Barry M. Barash at $400 per hour and paralegal Douglas E. Main at $150 per hour, the same rate as three associate attorneys listed in the table.

The Retention Agreement further provides that time is billed in 1/10th of an hour increments, and that, for example, "a short telephone call will be billed at 1/10th of an hour," that a "longer call will be billed at 3/10ths of an hour," and that a "letter or e-mail is usually billed at 3/10ths of an hour."

The Retention Agreement calls for double-staffing via "The Mayo Clinic Model" with a senior attorney paired with a junior attorney or senior paralegal. It explains that "[s]ome may consider our staffing procedures as 'double-billing' or 'overstaffing.' Please be assured that we are sensitive to this issue but the complexity of a reorganization case coupled with the results that our clients expect require us to staff our cases as outlined in this section."

The Retention Agreement further provides that if the client requests B&E to "avoid and recover a preference or fraudulent conveyance or to collect money for you (including collection of your accounts receivable)" that B&E will be paid an "additional contingent

fee" plus costs. The Retention Agreement is dated December 13, 2007, and is signed on behalf of the DEBTOR by Brent King as Chief Restructuring Officer.[1]

The DEBTOR'S assets were sold under § 363 of the Bankruptcy Code pursuant to Order entered April 24, 2008. By Order entered August 4, 2008, the case was converted to Chapter 7. On July 10, 2008, B&E filed its Fee Application seeking an award of fees and costs in the amount of $93,323.51, with attached time records showing billings from November 27, 2007 through July 9, 2008. Specifically, the Fee Application identifies fees and costs incurred in the Chapter 11 bankruptcy case of $75,741.51, fees and cost incurred in seven adversary cases of $15,576, and fees of $2,006 charged to something called "Master Collection File." It shows a credit for $31,039 (one -third of the retainer) and a balance due of $62,284.51.

The UST raises four objections. First, that no fee is due for work on the adversaries, for which the fee is contingent upon actual recovery. Second, the UST challenges the reasonableness of the fee request in view of B&E's practice of using .3 hours as a minimum billing increment. Third, the UST asserts that certain entries reflect unbillable secretarial services. Fourth, the UST challenges the time entries made by or on behalf of paralegal Doug Main as word for word duplicates of those for senior attorney Barash. Without detail

---

[1] The DEBTOR never filed a motion for authorization to retain Mr. King or to approve his retention as CRO. On January 31, 2008, the DEBTOR filed a Schedule of Salaries listing Mr. King as Chief Restructuring Officer receiving a salary of $7,000/week ($364,000 on an annual basis), which was approved without objection. An additional "success fee" of $100,000 was paid to Mr. King by the major secured creditor following sale of all of the DEBTOR'S assets. The Motion to Confirm that fee states that Mr. King was hired by Moglia Associates, an entity retained by the DEBTOR prepetition to advise and assist its restructuring, but that resigned within a few weeks of the filing. Ms. Ginger makes no claim that Mr. King was not authorized to execute the Retention Agreement on CIE's behalf.

The hiring of a CRO to manage a debtor's business in bankruptcy can be problematic, potentially conflicting with or superceding the possibility of appointing a Chapter 11 trustee. *See In re Blue Stone Real Estate, Const. & Development Corp.*, 396 B.R. 555 (Bankr.M.D.Fla. 2008). Even where the CRO is hired prepetition, the better procedure is to seek approval of the retention from the bankruptcy court, at which time the retention may be weighed against the alternative of a Chapter 11 trustee, an alternative that the UST should routinely consider in such cases.

3

specific to Mr. Main's activities, she argues that it cannot be determined what he actually did, what value his services provided, and whether the charges for his time are reasonable.

An objection to the Fee Application was also filed by Suzanne M. Ginger, a member of the DEBTOR'S Board of Directors. She objects to time billed by Mr. Barash for speaking with the media, to time billed before B&E was hired, and to time billed after the asset sale. She also claims B&E failed to timely convert the case to Chapter 7 following the asset sale as desired by the DEBTOR'S remaining directors. She asserts that rather than promptly converting the case to Chapter 7, B&E filed avoidance actions even though the Board did not request or want such actions filed.

B&E's response to Ms. Ginger's objection begins with accusations of conflicts of interest by Ms. Ginger because of her involvement, and that of her husband, in the creation of the ethanol plant project. B&E claims that it has a "fiduciary duty . . . to avoid and recover preferences and fraudulent conveyances," that Mr. King as Chief Restructuring Officer authorized B&E to file five avoidance actions, that B&E and Mr. King decided that Ms. Ginger was "hopelessly conflicted" and therefore should not be consulted with respect to the filing of avoidance actions, which included an action against her husband's firm.[2]

On June 10, 2008, B&E filed an adversary complaint on behalf of the DEBTOR against Froeling, Weber, Evans & Schell, LLP to avoid and recover payments of at least $647,526.39 as preferences, fraudulent transfers or postpetition transfers. The adversary remains pending, although Mr. Barash was not retained as counsel for the Chapter 7 Trustee.

---

[2]The docket contains several pleadings evidencing a breakdown of the relationship between B&E and Ms. Ginger, one of only two remaining directors, culminating with B&E's filing of a Motion on June 12, 2008, to remove Ms. Ginger as a director and officer of the DEBTOR, and the Motion filed on July 14, 2008, by Green Lion to disqualify B&E.

4

Also on June 10, 2008, B&E filed an adversary complaint on behalf of the DEBTOR against Hiel Trucking, Inc., to avoid and recover payments of at least $188,042.66 as preferences, fraudulent transfers or postpetition transfers. The adversary remains pending, although Mr. Barash was not retained as counsel for the Chapter 7 Trustee.

Also on June 10, 2008, B&E filed an adversary complaint on behalf of the DEBTOR against Jeffries & Company to avoid and recover payments of at least $303,086.18 as preferences, fraudulent conveyances or postpetition transfers. The adversary remains pending, although Mr. Barash was not retained as counsel for the Chapter 7 Trustee.

On June 24, 2008, B&E filed an adversary complaint on behalf of the DEBTOR against Green Lion Bio-Fuels, LLC to avoid and recover $360,000 in fraudulent transfers and a $60,000 payment as preferential. The adversary remains pending, although Mr. Barash was not retained as counsel for the Chapter 7 Trustee.

Motions to convert the case to Chapter 7 were filed on July 10, 2008, by Froeling, Weber, Evans & Schell, LLP, and on July 17, 2008, by the UST, and conversion was ordered on August 4, 2008.

## ANALYSIS

**A. The Lodestar Computation**

The Supreme Court has adopted the lodestar approach as the "centerpiece" of attorney fee awards. *Blanchard v. Bergeron,* 489 U.S. 87, 94, 109 S.Ct. 939, 945 (1989). The initial estimate of a reasonable attorney fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. *Id.*

5

The "Johnson factors" may then be applied to adjust the lodestar amount, if appropriate.[3] *Id.*

Initially, it is important to note that no objection has been raised to the hourly rates charged by B&E in this case. In the absence of such an objection by a party in interest, the Court will accept the unchallenged rates as reasonable.[4] The objections raised here relate primarily to whether the time charged was reasonably expended.

**B. Split Retainer**

The agreement between B&E and the DEBTOR provides that one-third of the retainer shall become the immediate property of B&E and may be deposited in B&E's general account, not its trust account. The remaining two-thirds is considered the DEBTOR'S property to be held in B&E's trust account. In two recent cases, this Court determined that retainers paid under identical agreements were security retainers that had to be held, in full, in B&E's trust account, and that the split retainer concept used by B&E was impermissible under *Dowling v. Chicago Options Associates, Inc.,* 226 Ill.2d 277, 875 N.E.2d 1012 (2007).[5] The same reasoning is applicable here and the Court disapproves the split retainer concept set forth in the agreement between the DEBTOR and B&E.

---

[3] Twelve factors to aid courts in analyzing the reasonableness of attorney fees are set forth in *Johnson v. Georigia Highway Exp., Inc.,* 488 F.2d 714 (5th Cir. 1974). Those factors are routinely used by federal courts when evaluating attorney fee applications. The *Johnson* factors are not helpful here, since the objections are directed toward specific time entries rather than to the reasonableness of the total attorney fee amount.

[4] The Court is nevertheless uncomfortable with the increased rate of $400 used by Mr. Barash, up 33% from his usual rate of $300, and the rate of $150 used by Mr. Main, up 36% from his usual rate of $110 and equivalent to associate attorneys, which appear to be increases that apply only to this specific case, a practice that is at least unusual if not unprecedented. An attorney's hourly rate is intended to reflect his perceived value in the marketplace at a particular point in time. Thus, the attorney's actual billing rate for comparable work is presumptively appropriate to use as the market rate that constitutes his reasonable hourly rate. *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 555 (7th Cir. 1999). An attorney's hourly rate should not be a moving target that goes up or down based upon considerations other than the nature of the legal services. Such a lack of consistency would impair the validity of the rate for purposes of the lodestar computation.

[5] *See In re SVI Media, Inc.,* 2008 WL 4767454 (Bankr.C.D.Ill. 2008).

**C. Attorney - client issues.**

Various pleadings outline the breakdown of the relationship between Ms. Ginger and B&E. Much is alleged and little is established, but certain basic facts are evident.

1. Despite her original intent to hire B&E to represent Green Lion, Ms. Ginger was directly involved in the retention of B&E to represent the DEBTOR in the bankruptcy case and she must have approved the retainer paid to B&E.

2. Despite the DEBTOR'S hiring of Moglia & Associates along with Mr. King as Chief Restructuring Officer, Ms. Ginger and Mr. Sutor, as the two remaining directors, remained "in charge" of the DEBTOR, nominally, legally and practically.

3. Even though the case remained in Chapter 11 for a number of months, after the December 18, 2007 meeting with Credit Suisse (just 5 days after the bankruptcy filing), all involved believed that reorganization was impossible and that full liquidation of the DEBTOR'S assets in cooperation with Credit Suisse was in the best interest of creditors.

4. The filing of the various adversary proceedings by B&E in June, 2008, several weeks after the sale of substantially all of the DEBTOR'S assets, served no Chapter 11 purpose.

5. Although B&E filed a Motion to remove Ms. Ginger from her directorship, the Motion was never granted and Ms. Ginger retained her position as a director of the DEBTOR.

Although it is not necessary for the Court to address all of the detailed allegations of the difficulties that arose between B&E and Ms. Ginger, certain general observations are appropriate in order to determine the reasonableness of B&E's fees.

First, the DEBTOR could have fired B&E for any reason at any time during the course of the representation. The relationship between attorney and client is terminable at will. *Grund v. Donegan,* 298 Ill.App.3d 1034, 1038, 700 N.E.2d 157 (Ill.App. 1 Dist. 1998); *Rhoades v. Norfolk & W. Ry. Co.,* 78 Ill.2d 217, 230, 399 N.E. 2d 969, 975 (1979). Upon

termination, B&E would have been obliged to withdraw from the case. *See* Rule 1.16(a)(4) of the Illinois Rules of Professional Conduct. As an officer, Mr. King served at the Board's pleasure and could have been terminated at any time as well. Despite her position as director, nothing in the record indicates that Ms. Ginger ever proposed or took any action to terminate B&E or Mr. King. The Board's failure to take such action is, at the very least, inconsistent with her allegations that B&E and Mr. King were acting in a manner contrary to the Board's wishes.[6]

Second, B&E's response to Ms. Ginger's objection states the opinion of B&E and Mr. King that Ms. Ginger was "hopelessly conflicted," thereby relieving them of the obligation to consult her before filing the avoidance actions. Assuming, arguendo, that Ms. Ginger had a conflict of interest, the state law rules that govern a director's obligations in the face of a conflict of interest are a separate issue from a lawyer's obligation to consult with his client. Perhaps Ms. Ginger should have consulted her own counsel with respect to her obligations. Perhaps she did so. Regardless, this Court is aware of no authority to support the position that a lawyer need not consult with a client whenever the lawyer believes the client is conflicted. *See* Rule 1.2(a) and Rule 1.4 of the Illinois rules of Professional Conduct.[7]

Third, B&E and Ms. Ginger apparently agreed that following the asset sale, the only option was conversion to Chapter 7. Ms. Ginger sought immediate conversion while B&E

---

[6]The gist of Ms. Ginger's allegations is that B&E and Mr. King pursued, after the asset sale, their own agenda, and intentionally kept her and the Board out of the loop, so as to avoid receiving contrary directions. The client always has the right to control its lawyer, and the lawyer has the obligation to consult with the client. Whether the directors appreciated it or not, they had the power and authority to control and direct the actions of B&E and Mr. King.

[7]It almost goes without saying that the remedy for serious strategic differences between a lawyer and client is for the lawyer to withdraw. Generally, it is not a permissible option for the lawyer to ignore the client and pursue his own path.

8

delayed conversion until after certain avoidance actions had been filed, including one against her husband's law firm. Under the circumstances, there was no justification for filing avoidance actions on the eve of conversion. The Chapter 7 Trustee has been substituted as the proper party-plaintiff, so the fact that the actions were initiated preconversion by the DEBTOR is immaterial to their continued prosecution. B&E's request for attorney fees for filing the adversaries should be denied for the reasons addressed hereafter.

**D.  Media Communications**

Ms. Ginger objects to three hours billed by Mr. Barash for talking to the press, which she characterizes as "advertising for Mr. Barash." Ideally, the issue of communications with the media should have been discussed and agreed upon at the initial conference stage. Here, again, the Board could have given direction to B&E about this, but apparently did not do so. It is not uncommon for a lawyer in a case such as this that involves the public interest to speak with the press and to charge for such time. The Court does not find three hours for media communications to be unreasonable.

**E.  B&E's Pre-filing charges**

Ms. Ginger alleges that B&E was not hired until December 13, 2007, the day the petition was filed, and should not be compensated for over 40 hours of time billed before that date. The Retention Agreement, signed by Mr. King as Chief Restructuring Officer, is dated December 13, 2007. Ms. Ginger correctly points out that the Retention Agreement makes no specific reference to time billed before the date of the Retention Agreement. She also refers to efforts by B&E to oust Sidley and Austin as DEBTOR'S counsel.

9

Ideally the Retention Agreement would have been prepared and executed shortly after the initial conference. Consistent with the date on the Retention Agreement, Minutes of a Special Meeting of Directors reflect formal action by the Board to retain B&E occurred on December 13, 2007.

Ms. Ginger cites no authority to support her contention that B&E is prohibited from being compensated for time incurred prior to execution of a written employment agreement and this Court is aware of no such authority. In this Court's experience, it is customary for a Chapter 11 lawyer to be compensated for reasonable time spent preparing for the filing and for the flurry of activity that usually occurs shortly thereafter. While B&E may have been lax in failing to prepare the Retention Agreement and the Minutes earlier, in this Court's view, that is not a basis to deny reasonable compensation for prefiling services.

Neither does the record support Ms. Ginger's assertion that B&E spent significant time attempting to remove Sidley and Austin as DEBTOR'S bankruptcy counsel. The only such reference appears in Mr. Barash's time entry on December 8, 2007, as follows:

> Review Evans' e-mail saying Smith and Randy Roy resigned.
> Also retained Barry Barash as bankruptcy counsel; relieved
> Sidley & Austin as bankruptcy counsel; employed Moglia
> advisors; and appointed Brent King as CRO.          0.30

B&E's time records do not reflect charges for acting to remove Sidley and Austin, if such activity did occur.

**F. Adversary Fees**

Ms. Ginger alleges that B&E exceeded the scope of its employment by filing various avoidance actions rather than pursuing conversion following the sale of assets, actions that

the Board neither requested nor authorized. In response, B&E asserts that the actions were authorized by Mr. King so that Board approval was unnecessary. In this Court's view, Mr. King, as Chief Restructuring Officer responsible for the operations of the plant, had no authority to establish policy or direct counsel. This authority reposed with the Board of Directors. Moreover, there was no reason for the DEBTOR, rather than the soon-to-be appointed Chapter 7 trustee, to file the avoidance actions. This Court disagrees with B&E's statement that Mr. King, B&E and the Board all had a fiduciary obligation to investigate and prosecute preferences.[8] The UST also opposes payment of fees incurred in four adversaries, those against Hill Trucking, Jeffries & Co., Sidley & Austin and the Froeling, Weber firm. B&E agreed to handle all adversary litigation on a contingent fee basis, with the fee earned upon recovery and collection. The objections are well taken and no fees should be awarded B&E on account of its filing any of the adversary complaints.

**G. Minimum billing increment**

The UST challenges B&E's practice of using .3 hours as its minimum billing increment for brief tasks, alleging that the 82 such entries made by Mr. Barash should be reduced to .2 hours. This Court previously addressed this exact issue with B&E in its opinion in *SVI Media, supra.* For the reasons stated therein, the 82 entries will be reduced to .2 hours each, as requested by the UST, for a reduction of $3,280.00.[9]

---

[8] While a Chapter 7 Trustee has a duty to investigate the debtor's affairs, and to identify and pursue avoidance actions, a Chapter 11 debtor in possession ("DIP") has no such duty. The Code clearly excludes a DIP from the duty to investigate the financial affairs of the debtor or to collect and reduce to money the property of the estate. 11 U.S.C. §§ 1107(a), 1106(a)(2), (3) and (4) and 704(a); 7 COLLIER ON BANKRUPTCY ¶ 1107.02[2][b] (15th ed.rev.). In cases that begin under Chapter 11 and then convert to Chapter 7, a DIP's preconversion initiation of avoidance actions effectively usurps the independence and authority of the Chapter 7 Trustee. Furthermore, there is almost never a business justification for a Chapter 11 DIP to file avoidance actions. *Gleischman Sumner Co. v. King, Weiser, Edelman & Bazar,* 69 F.3d 799, 801 (7th Cir. 1995) (Easterbrook, J.). If a DIP believes reason exists to prosecute an avoidance action, the better procedure would be for it to file a motion for leave to initiate an avoidance action, in which its purpose in furtherance of the Chapter 11 case could be explained. It follows that the initial application to retain debtor's counsel should ordinarily not include a request for authorization to pursue avoidance actions.

[9] There are 106 entries of .3 hours, 82 by Mr. Barash and 14 by paralegals. There are also three entries of .1 hours by a paralegal for emailing a document. There are no other entries less than .3 hours.

11

**H. Shadow Billing**

B&E's Statement reflects ten (10) entries for time recorded by or on behalf of paralegal Douglas E. Main totaling 47.50 hours at $150.00 per hour for a time value amount of $7,125.00. Each of the 10 entries is an exact duplicate of an entry made by Mr. Barash – same description, same day and same amount of time. This practice of duplicate billing by a paralegal will be referred to as "shadow billing."

The UST objects to this shadow billing, arguing that Mr. Main's entries do not appear to have been recorded by him and do not reflect the services he actually provided so that it cannot be determined what value his presence added. The UST's objection is valid. To be reimbursable, the purpose of the paralegal's work must be sufficiently specified. *Role Models America, Inc. v. Brownlee,* 353 F.3d 962, 974 (D.C.Cir. 2004). Mr. Main, a paralegal whose billing rate in this particular case was unusually high and equivalent to that of an associate attorney, is held to the same billing standards as attorneys.

In most cases, the function of a paralegal is to assist a supervising attorney by performing routine tasks that could be performed by a lawyer, but may also be effectively performed by a nonlawyer with legal services training or experience as a lower cost alternative. That is apparently not how Mr. Main was utilized, generally, by B&E in this case. Prefiling, between November 30, 2007, and December 4, 2007, he attended three lengthy client conferences or meetings that totaled 7.50 hours. His next time entry is on February 5, 2008 when he attended a 7.0 hour conference and engaged in related pleading preparation and filing. Six days later, on February 11, 2008, Mr. Main accompanied Mr. Barash to the DEBTOR'S first meeting of creditors for 5.50 hours. On February 21, 2008,

he spent 6.5 hours with Mr. Barash on research and preparation for the February 26, 2008 hearing, which he then attended for 6.75 hours. He attended another court hearing on March 12, 2008, for 4.0 hours, as well as the initial hearing on the sale of assets on April 9, 2008, for 4.0 hours. Mr. Main's last entry is on April 23, 2008, for 6.25 hours for attending the final hearing to approve the asset sale and a post-hearing client conference.

The Court concludes, first, that the concept of shadow billing, to the extent that a paralegal piggybacks on the description of services provided by a supervising attorney with no differentiation whatsoever, is antithetical to the requirement of individualized time entries for all billing personnel.

Second, this Court is well familiar with Mr. Barash's reliance upon Mr. Main. The question here is whether the double staffing that occurred with Mr. Main is reasonable under the circumstances of this case. Significantly, as acknowledged by B&E, the case was in liquidation mode from December 18, 2008, forward, with the major secured lender, Credit Suisse, calling the shots. The DEBTOR'S principals and attorneys had decided to cooperate with Credit Suisse in a sale in bankruptcy of all of the DEBTOR'S assets.

The UST's point is a good one. Generally, there should be some demonstrable linkage between a staff member's billed time and the necessity of or purpose for the expenditure and billing of such time. Usually, such linkage is fairly obvious from the description of the specific services performed. By simply parroting Mr. Barash's time entries, without an individualized description of what Mr. Main actually did, Mr. Main's value to the case is opaque.

Certain anticipated value may reasonably be inferred from the time spent by Mr. Main early in the case, when reorganization was still thought possible. That possibility, as well as the size and complexity of the case, warranted Mr. Main's participation in the prefiling conferences. The reasonableness of his participation thereafter, when liquidation was the purpose, is more questionable. His time on February 5, 2008 and February 11, 2008 is justifiable as reasonably necessary to assist in the preparation of pleadings and at the 341 meeting. As well, his efforts at research on February 21, 2008 appear to be warranted.

However, Mr. Main's time spent on this case after that date is not justified via his time entries that duplicate those of Mr. Barash and the value of his attendance at the hearings cannot be inferred from the status of the case. Although Mr. Main's assistance in the drafting of additional pleadings may have continued to be reasonable, that is not what he did. B&E's time records reflect that Mr. Main simply attended hearings on February 26, March 12, April 9 and April 23, 2008. No other entries for his time were made during this period. Nothing in the record supports the conclusion that his attendance at these hearings was necessary or reasonable. Therefore, Mr. Main's time for those hearings, totaling 21 hours, must be deducted in the amount of $3,150.00.

## I.  Billing for Clerical Work

It is unreasonable for an attorney or a paralegal to bill for work that is clerical or secretarial in nature. The UST objects to certain time entries by paralegal Pamela K. Mangieri on this basis. Her entries for emailing a document on April 8, 2008, on April 24, 2008, on April 29, 2008, and on May 20, 2008 totaling .60 hours will be denied for a reduction of $66.00.

**J. Master Collection File Fees**

The Fee Application requests attorney fees in the amount of $2,006.00 charged to "Master Collection File." No explanation or substantiation for this request has been submitted and, therefore, it will be denied in its entirety.

**K. Conclusion**

With respect to the Fee Application, the Court concludes as follows:

1. Barry M. Barash charged fees of $62,640.00; $3,280.00 will be disallowed; $59,360.00 will be allowed.

2. Douglas E. Main charged fees of $7,125.00; $3,150.00 will be disallowed; $3,975.00 will be allowed.

3. Pamela K. Mangieri charged fees of $3,613.50; $66.00 will be disallowed; $3,547.50 will be allowed.

4. Jennifer E. Timmons charged fees of $517.00 which will be allowed.

5. Expenses in the main bankruptcy case are charged of $1,851.01 which will be allowed.

6. For seven adversary proceedings, fees are claimed of $13,749.00 and expenses of $3,673.01. These fees and expenses will be denied. This denial of expenses is without prejudice to a future request for reimbursement of same by the TRUSTEE.

7. Fees of $2,006.00 billed to "Master Collection File" will be denied.

Allowed fees and expenses total $69,250.51. A retainer of $91,039.00 was paid to B&E. Payment of the allowed fees and expenses from the retainer is authorized. B&E is directed to remit to the TRUSTEE the unused retainer balance of $21,788.49.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###